**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| DANIEL BRIAN SUMPTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-CV-00049 CAS/NAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Daniel Brian Sumpter's ("Sumpter") application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.*, and 42 U.S.C. § 1381 *et seq.* Sumpter alleged disability due to a lower back injury sustained on February 23, 2007, and various mental health issues. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). Sumpter filed a Brief in Support of the Complaint. (Doc. #15.) The Commissioner filed a Brief in Support of the Answer. (Doc. #17.) Sumpter filed a Reply. (Doc. #18.) For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

## I. Procedural History

On September 29, 2008, Sumpter filed an application for a Period of Disability and Disability Insurance Benefits. On September 30, Sumpter filed an additional application for Supplemental Security Income. In both applications, Sumpter alleged an onset date of February 23, 2007. (Tr. 124, 128.) The Social Security Administration ("SSA") denied both of Sumpter's claims on January 13, 2009. (Tr. 56.) Sumpter filed a timely request for a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 63.)  Following a hearing before an ALJ, the ALJ

issued a written decision on April 29, 2010, upholding the denial of benefits.  (Tr. 10-24.)  On

May 26, 2011, the Appeals Council denied Sumpter's request for a review.  (Tr. 1-3.)  The ALJ's

decision thus stands as the Commissioner's final decision.  Sumpter filed this appeal on July 7,

2011.

## II.  Administrative Record

### A.  Testimony Before the ALJ

On March 22, 2010, ALJ Eleanor T. Moser held a hearing.  Sumpter appeared with

counsel.  Sumpter and Margaret Kelsey, a vocational expert ("VE"), testified at the hearing.  (Tr.

30-31.)

#### 1.  Sumpter's Testimony

Sumpter testified that he was 43 years old as of the hearing date.  He completed eleventh

grade and never attended college.  (Tr. 33.)  He testified that he was in a special education class

in school because he was "slow" and easily distracted.  (Tr. 39.)  Sumpter worked a variety of

jobs during the fifteen years before the hearing.  At Barnes Greenhouse, he testified that he put

plants in containers and took them to a greenhouse.  He would let them grow until the plants

were loaded onto a truck and sent elsewhere.  He lifted about five pounds while working at

Barnes.  (Tr. 42.)  He testified that he was released from Barnes in February of 2009, two years

after he claimed his disability began, because Barnes was unable accommodate his medical and

mental health appointments.  (Tr. 35.)  At Premium Home Farms, he packed and unloaded

household goods from a tractor-trailer.  (Tr. 41-42.)  He laid innerduct for AT&T.  He also

testified that before 2007, he worked as a furniture mover, construction worker, and food court

janitor.  (Tr. 34.)

Regarding his physical condition, Sumpter testified that he injured his back in February 2007, while on the job at Premium Standard Farms. He said that he was power washing a pig feeder, and that his back "went out on him" when he bent over to clean it. (Tr. 41-42.) He saw Dr. Zarr, the workmen's compensation doctor for Premium Standard Farms. Dr. Zarr ordered permanent restrictions for Sumpter, including no bending and a limit of five pounds for any lifting. (Tr. 42, 263.) Sumpter testified that he suffered from chronic back pain. He would lie down and prop up his legs for about three hours, three or four times per day to help relieve the pain. He testified that he could stand and wash the dishes for ten minutes before he had to lie down. Normally, he could sit in a chair for fifteen minutes before he had to lie down. (Tr. 40-41.) Sumpter testified that he still suffered from a childhood injury to his rotator cuff. That injury did not impact his ability to work in the past. (Tr. 43.)

As to his mental health, Sumpter testified that he had bipolar disorder. He told the ALJ that he was being treated for bipolar disorder about once every three months by Dr. Blount at Burrell Behavioral Health ("Burrell"). Sumpter stated that his condition had improved slightly with medication, but he still had anger episodes virtually every day. (Tr. 37-38.) Sumpter heard sleep-disrupting voices about three times per week. He took sleep-aids, but was able to sleep for about three hours when he heard voices. The medications caused daytime drowsiness. He occasionally fell asleep sitting up. (Tr. 44-45.) Sumpter testified that he thought that one of his doctors told him that he was schizophrenic, but was unsure. (Tr. 43.) He was dependent on marijuana until about 2006. (Tr. 49.) He testified that he was in a counseling program, and saw his caseworker every two weeks. (Tr. 38.) He stopped living with his girlfriend and moved in with his mother because he would get angry and break things. (Tr. 38-39.) He was previously married, and has two grown children. (Tr. 45.) He testified that he did not smoke or drink. He

stated that he is unable to go to the grocery store, purchase something, return home, and count the change.  (Tr. 48.)

### 2.      VE Margaret Kelsey's Testimony

The VE testified that Sumpter's work as an automobile detailer and janitor was classified as medium, unskilled work.  Using Sumpter's description, the VE classified Sumpter's work as a furniture packer as heavy and unskilled.  The VE classified Sumpter's work as a cable placer as heavy and semi-skilled.  The VE classified Sumpter's work as an animal caretaker at Premium Standard Farms as medium and semi-skilled.  The VE classified Sumpter's work at Barnes Greenhouse as light and semi-skilled, according to his description.  (Tr. 46-47.)

The ALJ posed one hypothetical to the VE.  The ALJ asked the VE whether an individual of Sumpter's age and work history could perform Sumpter's past work with the following physical restrictions: (1) can lift twenty pounds occasionally and ten pounds frequently; (2) can stand or walk six out of eight hours; (3) can sit six out of eight hours; (4) has back pain which has been treated through medication, physical therapy, and some injections; (5) can climb, stoop, kneel, crouch, or crawl occasionally; (6) can never climb ropes, ladders, or scaffolds; (7) is limited in reaching over his head; (8) should avoid concentrated exposure to extreme cold; and (9) can have moderate exposure to hazards, machinery, and heights.  The ALJ posited moderate limitations in the following mental abilities: (10) to understand, remember, and carry out detailed instructions; (11) to maintain attention and concentration while carrying out detailed instructions; (12) to work with or near other people without distraction; (13) to complete a normal work day and week; (14) to perform at a consistent pace; (15) to interact appropriately with the general public; (16) to respond appropriately to criticism from supervisors; (16) to maintain socially appropriate behavior and standards of neatness and cleanliness; (17) to respond appropriately to

changes in the work setting or travel to unfamiliar places; (18) to use public transportation; (19) to set realistic goals or make plans independently with others. The ALJ apparently also incorporated into the hypothetical Sumpter's testimony that he cannot count change upon returning home from the grocery store. (Tr. 47-48.) The VE opined that such an individual would be able to work as a greenhouse worker as Sumpter had described it, but not as the job is usually performed in the national economy. (Tr. 49.)

Next, the ALJ asked whether there were any other jobs in the national economy that the same hypothetical individual could do. The VE responded that the individual would be able to do light, unskilled work as an apparel stock clerk, a motel housekeeper, or a small part assembler. Combined, there were 3,700 of those jobs in Missouri and 423,000 in the national economy. (Tr. 49.)

On cross-examination, Sumpter's counsel posed two hypotheticals. First, counsel asked whether a hypothetical individual would be able to do any work in the national economy if that individual had no ability to respond appropriately to work pressures in a usual work setting. The VE testified that the individual could not. Second, counsel asked whether an individual would be capable of substantial gainful employment if that individual had marked limitations in his ability to: (1) understand, remember, and carry out detailed instructions; (2) make judgments on simple work-related decisions; (3) interact appropriately with supervisors and coworkers; and (4) respond appropriately to changes in the work setting. The VE testified that such an individual would not be capable of substantial gainful employment. (Tr. 51.)

## B.  Mental Health Records Before the ALJ

On February 23, 2007, Sumpter injured his back while working at Premium Standard Farms. (Tr. 260.)

On March 23, 2007, Sumpter was seen by James S. Zarr, M.D., for a back injury. Dr. Zarr did not note any mental health issues, nor did he note any past substance abuse. Sumpter denied current use of alcohol. (Tr. 255-56.)

On April 2, 2007, Dr. Zarr learned that Sumpter had been in drug rehab for methamphetamine use, and discontinued narcotic pain medications. (Tr. 249, 251.)

On May 15, 2007, Sumpter was seen by Dea D. Campbell, D.O., for his back pain. Dr. Campbell noted no indications of psychological problems. (Tr. 295.)

On June 1, 2007, Dr. Campbell again noted no indications of psychological problems. (Tr. 294.)

On June 13, 2007, Dr. Campbell noted that Sumpter was "getting depressed," and prescribed Xanax. (Tr. 292.)

On July 18, 2007, Sumpter was evaluated by Norman F. Baade, D.O., at the Heartland Regional Medical Center for Pain Management. Dr. Baade noted no mental problems in Sumpter's medical history. (Tr. 300.) However, Sumpter did complain that his back pain was causing sleeplessness, irritability, and depression. (Tr. 303.)

On August 7, 2007, Sumpter went to the Wright Memorial Hospital Emergency Room, complaining of back pain. The admitting physician declined to prescribe any controlled substances after learning that Sumpter was on probation for a drug offense and that he had recently used various narcotics prescribed by different doctors. (Tr. 374.)

On August 22, 2007, Sumpter was examined by Alejandro J. Blachar, M.D., at Hedrick Medical Center. Sumpter reported that his pain had caused depression, concentration loss, sleeplessness, anger, crying, and irritability. Dr. Blachar noted that Sumpter showed signs of

anxiety.  Sumpter denied alcohol and tobacco use, as well as Schedule IV drug abuse.  (Tr. 322.)
Dr. Blachar planned to check a drug screening.  (Tr. 323.)

On October 31, 2007, Sumpter was seen by Dr. Blachar.  Dr. Blachar's report makes no
mention of any problems with the drug test ordered during Sumtper's previous visit.  (Tr. 324.)

On January 7, 2008, Sumpter was admitted to Wright Memorial Hospital with a fever,
chills, shaking, and swelling.  He denied alcohol, tobacco, or drug use.  (Tr. 396.)

On April 1, 2008, James A. Stuckmeyer, M.D., examined Sumpter for an Independent
Medical Evaluation.  Dr. Stuckmeyer noted that Sumpter took Xanax but did not address any
other mental health issues.  (Tr. 306-09.)

On April 10, 2008, Linda A. Siemer, a family nurse practitioner, saw Sumpter for stress
and erectile dysfunction.  Sumpter's stress level had increased and he reported irritability,
decreased appetite, headaches, a short temper, difficulty sleeping, loss of interest, and being
withdrawn.  He had a May appointment at North Central Missouri Mental Health Center ("North
Central"), but felt he needed medication before then.  He reported that the Xanax reduced his
anxiety and stress.  He denied a history of alcohol, tobacco, or drug use.  (Tr. 330.)  Siemer's
impression was that Sumpter had anger issues, anxiety, chronic back pain, depression, and
erectile dysfunction.  She gave him samples of an antidepressant (Lexapro), and wrote a
prescription for another antidepressant (Celexa).  She encouraged him to attend his appointment
at North Central.  (Tr. 331.)

On April 16, 2008, Sumpter saw Dr. Blachar for chronic lower back pain.  Dr. Blachar
noted that Sumpter was taking Xanax as needed based on an old anxiety prescription.  (Tr. 314.)
Dr. Blachar ordered Sumpter a drug screen.  (Tr. 313, 315.)

On June 17, 2008, Sumpter saw Siemer for a checkup and a medication refill. Sumpter reported that he did not take the prescribed antidepressants and stated that he felt he did not need to take medication or seek counseling. He reported that he went to the emergency room for back spasms on May 10, 2008. He was given Valium and Demerol. (Tr. 326.)

On July 9, 2008, Sumpter saw Dr. Blachar and reported that he experienced pain at 6/10 on the verbal analog scale. His mental status review was negative. Sumpter reported that the pain medication regimen was effective and he wanted it to remain unchanged. (Tr. 318.)

On September 7, 2008, Sumpter went to the Wright Memorial Hospital emergency room after an altercation with his girlfriend's son and one of his friends. Sumpter had soft tissue damage to his left cheek. He had an 8.5 blood alcohol level. (Tr. 346-47.)

On November 13, 2008, John Keough, M.A., a state-requested consultative psychologist, examined Sumpter. (Tr. 211-12, 410-13.) Sumpter reported he was angry, depressed, and had not slept well since his 2007 back injury. He believed that his injury caused his depression. Sumpter said that he had four or five panic attacks since his back injury. He said that he had been unable to get along with anyone since his injury. However, he had no problems with authority figures. He had problems remembering instructions. Sumpter took Xanax samples for six or seven months because he could not afford prescription medicines. (Tr. 410.) He denied any suicidal thoughts or any homicidal intent. (Tr. 411.)

Sumpter admitted that he began using alcohol, marijuana, and tobacco at age thirteen, but denied current use. He said he had a marijuana problem until his early thirties. He was on probation in 1993 for growing marijuana. Sumpter also reported serving eighteen months in prison for possession, delivery, and attempt to manufacture. The report does not specify the drug

involved.  Sumpter reported that he served 120 days in prison for driving under the influence ("DUI") in 2006 and that his license was suspended.  (Tr. 410-11.)

Keough reported that Sumpter understood the interview in context, followed and understood instructions, and interacted with Keough without difficulty.  Keough observed that Sumpter was "disheveled in appearance," wore night clothes, and had "questionable" hygiene. Keough believed that Sumpter might be "overemphasizing [his] symptomology."  Sumpter appeared to be experiencing "mild" anxiety and "mild to moderate" depression.  However, his "affective responses" were inconsistent with his subjective claims of a "marked" level of depression or anxiety.  Sumpter's speech was "relevant and goal directed."  Keough also found indications of borderline intellectual functioning.  (Tr. 411.)

Keough found Sumpter's ability to understand and remember instructions, on a sustained basis, necessary to make routine work-related decisions, without supervision, between simple and moderate complexity levels, without alcohol or other street drugs.  Keough believed Sumpter's concentration, persistence, and pace at a full-time job, for at least twelve consecutive months, adequate "up to a complex or demanding setting."  He found that Sumpter's psychological issues and history of substance dependence caused mild to moderate limitations in his work-related abilities.  He diagnosed Sumpter with dysthymic disorder, anxiety disorder, cannabis dependence in remission, and personality disorder.  (Tr. 412.)

On December 30, 2008, Keough administered the Wechsler Adult Intelligence Scale – Fourth Edition.  Sumpter reported no changes in his mental health status since the examination in November.  Sumpter received a full scale "IQ" score of 67, and subscale scores of 68 (verbal comprehension index), 82 (perceptual reasoning index), 74 (working memory index), and 62 (processing speed index).  Keough questioned Sumpter's motivation because he "did not appear

to be putting forth his best effort." (Tr. 414, 426.) Keough opined that Sumpter was "functioning in the Extremely Low Range." He did not opine as to the scores' validity. (Tr. 414.)

On January 12, 2009, Glen D. Frisch, M.D., a state psychiatrist, completed a psychiatric review. (Tr. 416-27.) Dr. Frisch found that an RFC assessment was necessary. (Tr. 416.) He believed Sumpter had mild limitations in daily living activities and moderate limitations in maintaining social functioning and maintaining concentration, persistence, and pace. Dr. Frisch also found no episodes of decompensation of extended duration. (Tr. 424.) Dr. Frisch found Keough's conclusions consistent with the overall evidence and gave them significant weight. (Tr. 426.) Dr. Frisch also completed a Mental RFC Assessment and found that Sumpter was moderately limited in eleven of twenty categories and not significantly limited in nine. (Tr. 428-29.)

Dr. Frisch concluded that Sumpter could understand simple instructions and make routine work-related decisions, had persistence and pace adequate to work up to a moderately complex setting, could adequately interact with coworkers provided there were "minimal demands for social interactions," and could adapt to minor changes in the work setting. (Tr. 430.)

On January 20, 2009, Sumpter was seen by Dr. Blachar. Sumpter's mental status review was negative. (Tr. 442-43.)

On May 5, 2009, Sumpter was seen by Dr. Blachar. Sumpter reported insomnia and denied smoking or drinking. Sumpter's mental status review was negative. (Tr. 444-45.)

On July 24, 2009, Dr. Blount gave Sumpter an initial psychiatric evaluation by telephone. Sumpter complained of agitation, and was "afraid he [would] lose it." He reported that since the his stepfather's death six years before, he was depressed, irritable, easy to anger, and explosive.

He was afraid he would hurt someone.  He lived with his girlfriend and her children, who he described as disrespectful.  He reported problems with sleeping, guilt, and concentration.  He wished he had died instead of his stepdad.  He thought that his anger and anxiety had a serious impact on his employment and relationships.  (Tr. 437.)  He disclosed that his driver's license had been suspended for DUI and that he had previously used marijuana and methamphetamines.  (Tr. 439.)

Sumpter said he was diagnosed with recurrent major depressive disorder, panic disorder with agoraphobia, and ADHD as a child.  Sumpter told Dr. Blount that he was on Seroquel (an atypical antipsychotic), and that he had been prescribed Haldol (a typical antipsychotic) and Cogentin (an anticholinergic), but did not take them.  (Tr. 438.)  He also told Dr. Blount that he saw a Dr. Wisdom for a few years, underwent counseling in Trenton, Missouri.[2]  (Tr. 437.)

Sumpter was alert and cooperative, but depressed.  (Tr. 437.)  Dr. Blount diagnosed Sumpter with Major Depressive Disorder, Panic with Agoraphobia, and ADHD.  He estimated Sumpter's GAF as 55.[3]  (Tr. 440.)  Dr. Blount prescribed an antidepressant (Celexa), Seroquel, and Valium as needed for anxiety or panic attacks.

On July 28, 2009, Sumpter met with Sharon Heisdorffer, a social worker from Burrell.  Sumpter and Heisdorffer discussed his life, and Sumpter identified personal goals.  (Tr. 452.)

On August 7, 2009, Sumpter met with Heisdorferr and his new case worker, Tara Reagan.  Sumpter reported that his girlfriend and other housemates were causing him stress.  He

---

[2] The administrative transcript does not reflect a previous diagnosis of either major depressive disorder or panic disorder or a prescription for either Cogentin or Haldol.  Further, there are no records from Dr. Wisdom or from any counseling in Trenton.  North Central Center, which Sumpter told Siemer he planned to visit, is headquartered in Trenton.  *See* North Central Missouri Mental Health Center , *Locations of the North Central Missouri Mental Health Center*, *available at* http://www.ncmmh.org/locations.htm (last accessed June 26, 2012).

[3] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision, 2000) [hereinafter DSM-IV-TR].

"expressed a lot of anger and said someone may get hurt if something is not done."  He also discussed drug use.  (Tr. 455.)  He was told that he needed to take his prescribed mental health medications at this meeting.  (*See* Tr. 457.)

On August 13, 2009, Sumpter and Reagan discussed his stress and anxiety problems.  He identified his greatest stressors as his relationship with his girlfriend and her children.  Sumpter reported that he was taking his medications as directed.  (Tr. 457.)

On August 18, 2009, Sumpter met with Reagan at his mother's home.  He told Reagan that he had not been taking his medications, but he did not know why.  Reagan explained that failure to take his medications exacerbated his anger problems.  He agreed to take his medications.  He told Reagan that his girlfriend hit him the night before, and that he slapped her face.  Sumpter's mother was concerned that he was not taking his medication, and said that "she has never seen him so unable to control himself."  (Tr. 458.)

On August 25, 2009, Sumpter met with Reagan at his mother's home.  He admitted not taking his medications.  He also related to Reagan that his daughter kicked him out of her home because of his constant fighting with his girlfriend, but that his niece was taking him in.  He again agreed to take all of his medication.  (Tr. 459.)

On September 1, 2009, Sumpter skipped an appointment at his mother's home, but Reagan spoke to his mother.  His mother told Reagan that Sumpter refused to take his medications.  She also explained that Sumpter would not break up with his girlfriend even though their fights were getting "out of hand."  She also said that she believed that Sumpter was using illegal drugs.  (Tr. 460.)

On September 3, 2009, Sumpter cancelled an appointment with Reagan, and refused to reschedule.  He told her that he expected to be kicked out of his niece's home.  Reagan noted that Sumpter was "unwilling to admit his need for help at this time."  (Tr. 461.)

On September 4, 2009, Sumpter went into the Burrell office for a follow-up psychiatric evaluation.  During the evaluation, he reported panic attacks, depression, and stress.  He said that he was "almost homeless," and he discussed "suicide by cop."  Dr. Blount noted that Sumpter's money was all going to methamphetamine use.[4]  He also noted that Sumpter had not been taking his medications.  He increased Sumpter's Celexa prescription, decreased his Seroquel prescription, discontinued Valium, and prescribed Thorazine to take as needed for his anger.  He also noted that Sumpter should not be given an abusable substance.  (Tr. 462.)

Sumpter stopped and spoke briefly with Reagan in the Burrell office after his appointment with Dr. Blount.  She noted that he had difficulty making and keeping eye contact with her, that he did not sit still in his chair, and that his clothes were wrinkled.  (Tr. 463.)

On September 8, 2009, Sumpter met with Reagan at his mother's home.  Reagan's record indicates that Sumpter's girlfriend's children had been taken into state custody due to allegations of neglect.  Further, Sumpter and his girlfriend lacked a permanent lodging.  His mother financed a room at a Super 8 Motel for the previous two nights.  Sumpter denied using illegal drugs, and said that he was taking his medications.  (Tr. 464.)  Sumpter also saw Dr. Blachar.  He reported being on Thorazine, Valium, Seroquel, and Celexa.  (Tr. 448.)

On September 15, 2009, Reagan met with Sumpter at his mother's home.  He told Reagan that he was still homeless.  (Tr. 465.)

---

[4] It is not clear if this is based on the social worker's report, or if Sumpter relayed this information directly.

On September 22, 2009, Reagan arrived at Sumpter's mother's home to help with his job search. He told her that he would not look for a job that day because he did not feel well and was tired. He also admitted that he had not been taking his medications. (Tr. 468.)

On October 2, 2009, Sumpter called Reagan and told her that he and his girlfriend found housing at a trailer park. (Tr. 469.)

On October 5, 2009, Reagan met with Sumpter to discuss acquiring immediate rental assistance and employment so he could make subsequent payments. Reagan noted that Sumpter was reluctant to leave his mother's house and that he lacked the initiative to seek employment or obtain information needed for housing. She also opined that he needed constant direction from her or his mother. (Tr. 470.)

On October 6, 2009, Reagan helped Sumpter fill out a job application. Sumpter found it difficult to accurately complete the application, and became frustrated. Reagan was able to calm him down and help him complete the application. (Tr. 487.)

On October 12, 2009, Reagan met with Sumpter to help him find a primary care physician. She guided him through the process because of his "extensive history of not following through with directions unless under constant supervision." They were able to find a doctor who could take Sumpter's insurance, and scheduled an appointment. During their meeting, Sumpter complained that he slept poorly the night before because of acid reflux pain and difficulty breathing. Reagan noted that Sumpter could not sit still, and was constantly moving his legs. She also noted that his face was red throughout the appointment. Sumpter refused her recommendation that he see a doctor immediately, but agreed to go the emergency room if his symptoms worsened. Sumpter claimed to have taken all of his medications for the past two weeks. (Tr. 490.)

On October 19, 2009, Reagan met with Sumpter to help him fill out job applications. She once again noted that Sumpter required constant direction from his mother or the case worker in order to solve life problems. Sumpter reported that he was continuing to see his girlfriend, despite the fact that she caused him a great deal of stress and he was "constantly angry and upset with her." (Tr. 492.)

On October 26, 2009, Sumpter cancelled his appointment with Reagan because he was not feeling well. (Tr. 493.)

On October 30, 2009, Sumpter had a telehealth visit with Dr. Blount. Sumpter told Dr. Blount that he was very depressed, slapping people and getting violent, that life was not worth living, and that he was having trouble sleeping. He said he was not using methamphetamines. He said that he had some suicidal thoughts, but that he neither intended nor planned to kill himself because he could not do that to his family. He reported that he was still arguing and living with his girlfriend. He said that people were talking about him, and that he was afraid that he would get angry and harm someone. Dr. Blount made minor adjustments to Sumpter's medications. (Tr. 488.)

On November 3, 2009, Sumpter met with Reagan and told her about his suicidal thoughts. He was thinking about "suicide by cop" and was thinking of "taking out" his daughter's roommate. (Tr. 494.)

On November 10, 2009, Sumpter cancelled his appointment with Reagan, claiming that he had been diagnosed with swine flu.

On November 17, 2009, Reagan met Sumpter at his mother's home. He cried throughout the appointment, and said that he had gotten into a physical fight with his girlfriend. The police were called, and no arrests were made, but he was told to not have any contact with his

girlfriend.  He spoke about committing suicide.  Reagan advised Sumpter to seek hospitalization.

Sumpter agreed, and went to the Moberly Regional Medical Center emergency room.  (Tr. 496.)

On referral from Moberly, Sumpter was voluntarily admitted to Royal Oaks Hospital, a

behavioral health facility.  He told Royal Oaks that he needed help getting back on his prescribed

medications, and that he was "an emotional wreck."  He did not use his medications because he

did not believe that they helped him.  He reported using methamphetamines intravenously, with

the last use being November 13.  He also reported previous use of marijuana, crack, and cocaine.

He said that he felt suicidal a few days before.  He related his plan to do "suicide by cop," but he

also said that he planned to take a friend of his daughter who he did not like with him.  He

reported the fight with his girlfriend, and stated that they had broken up.  (Tr. 475-76.)  Royal

Oaks admitted Sumpter to the dual diagnosis unit[5] and placed him on suicide watch.  (Tr. 476.)

Iyad Khreis, M.D., estimated that Sumpter's GAF was 10.[6]  (Tr. 482.)

During Sumpter's first few days at Royal Oaks, he was started on a new medication

regimen.  On November 19, Sumpter reported feeling "fine," and Royal Oaks developed a

treatment plan for his anger, substance abuse, and suicidal thoughts.  On November 22, Sumpter

told staff in a psychiatric session that he felt depressed and he was sleeping poorly; he remained

isolated in his room and interacted with others very little.  By November 23, his mood improved,

and he agreed that Royal Oaks could contact his daughter's friend to warn him about Sumpter's

homicidal thoughts.  On November 24, he was "alert and cooperative", but he had "a depressed

mood" and "his affect was sad."  His condition further improved on November 25, and he was

reported to have been attending all group and activity sessions.  (Tr. 476-77.)

---

[5] A dual diagnosis is a diagnosis that a patient has both a mental disorder and a substance abuse problem simultaneously.  *See* U.S. National Library of Medicine, "Dual Diagnosis: MedlinePlus", http://www.nlm.nih.gov/medlineplus/dualdiagnosis.html (last accessed June 8, 2012).

[6] A GAF between 1 and 10 indicates a "[p]ersistent danger of severely hurting self or others (e.g. recurring violence) [or] persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.

On November 27, Sumpter was discharged because he met the treatment goals. He was taken to his mother's home, and told staff that he planned to live with his girlfriend when their situation improved. Dr. Khreis recommended that Sumpter start an inpatient rehab program and continue to seek psychiatric treatment for his anger, substance abuse, and suicidal thoughts. (Tr. 477-78.) Dr. Khreis diagnosed Sumpter with recurrent major depressive disorder, intermittent explosive disorder, anxiety disorder, polysubstance dependence, and antisocial personality disorder. He estimated Sumpter's GAF was 65, and had been 75 in the last year.[7] (Tr. 479.)

On December 4, 2009, Sumpter had a telehealth visit with Dr. Blount. Reagan was present to ensure that Sumpter was completely honest about his drug use and hospitalization at Royal Oaks, and she reported that Sumpter "was finally honest regarding his illegal drug use." Dr. Blount noted Sumpter's hospitalization, and that Sumpter "[s]tates he is staying clean." Dr. Blount planned to continue Sumpter's medications. (Tr. 489, 497.)

Following this visit, Dr. Blount completed a Mental Medical Source Statement. Dr. Blount opined that Sumpter was extremely limited in his ability to respond appropriately to work pressures in a usual work setting. He also felt that Sumpter's mental problems markedly restricted his mental abilities in the following areas:

- Understanding and remembering detailed instructions
- Carrying out detailed instructions
- Making judgments on simple work-related decisions
- Interacting appropriately with supervisors
- Interacting appropriately with co-workers
- Responding appropriately to changes in a routine work setting

---

[7] A GAF between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR, at 34. A GAF between 71 and 80 indicates that, "[i]f systems are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). *Id.*

Finally, Dr. Blount opined that Sumpter was moderately limited in:

- Understanding and remembering short, simple instructions
- Carrying out short, simple instructions
- Interacting appropriately with the public

Dr. Blount believed that Sumpter's problems with anger, attention, concentration, mood regulation, and dealing with others were responsible for his limitations in dealing with instructions. He found that Sumpter's anger issues, impairment in interacting with others, inability to take direction well, likelihood of exploding at people in authority positions, inability to handle change, and anxious and angry responses to changes in his environment or routine limited his ability to function in an ordinary work setting. In response to a question about whether Sumpter's alcohol or substance abuse contributed to any limitations, Dr. Blount wrote that Sumpter's limitations were "not grossly affected by substance abuse" as Sumpter was "staying clean at this time." In response to a question about Sumpter's limitations if he ceased abusing substances, Dr. Blount also noted that Sumpter was "abstinent." Finally, he felt that Sumpter would be unable to manage benefits in his own interest. (Tr. 472-74.)

On December 8, 2009, Sumpter was seen by Dr. Blachar, who noted that Sumpter had recently been released from Royal Oaks. Sumpter told Dr. Blachar that his medications "have helped him significantly." Sumpter reported being diagnosed with depression, bipolar, possible paranoid schizophrenia, and anxiety disorder. (Tr. 484.)

On December 9, 2009, Sumpter met with Reagan. He informed her that he was seeing his girlfriend again. Reagan explained to him that his relationship led to his hospitalization at Royal Oaks, but he affirmed his intent to continue to see his girlfriend. Sumpter said he wanted to take his medications as prescribed and refrain from using illegal drugs. (Tr. 498.)

**C.     Other Records**

On October 10, 2008, Sumpter's girlfriend completed a third party function report about him. According to his girlfriend, Sumpter spent most of the day with her. They talked, and sometimes walked or cooked together. Sumpter lived with her and three children. He did yardwork and housework until his back started hurting. She reported that he travels outside the home by riding in a car and public transportation. Sometimes went out alone, but he could not drive because his license was suspended. He shopped for household items or groceries in stores once every week or two. He could pay bills, handle a savings account, count change, and a use a checkbook or money order. He spent time with his family every day; talking, playing board games, and watching TV. He went to church, a weekly meeting, visited a neighbor, and talked to his family by phone. He did not need to be reminded to go places. She indicated that he had trouble completing tasks, getting along with others, and concentrating. His ability to follow written instructions was fair, and his ability to follow spoken instructions was good. He usually had no problem getting along with authority figures. He handled stress poorly, and was not good at handling changes in routine. She noticed that Sumpter started exhibiting unusual behavior, including moodiness, anger, and stress. She wrote: "He has become very depressed and angry because he cannot do the things he [used] to do and gets [aggravated] because he has required more help to do the things that he once was able to do on his own." (Tr. 173-180.)

On October 13, 2008, Sumpter completed a function self-report. He reported that he helped his girlfriend's children do their homework. He prepared meals, like sandwiches and frozen dinners, daily. His other reported activities reiterated and confirmed his girlfriend's statements. Additionally, he reported that he had problems getting along with others because his pain-induced anger made him antisocial. He ceased many social activities because of his back pain. Back pain also created problems with completing tasks and concentration. When his pain

was not too bad, he could pay attention "most of the time." He rated his ability to follow written instructions "fair," and his ability to follow verbal instructions "good." He reported that he got along with authority figures, and had never been fired or laid off because of trouble getting along with other people. He said that he was not good at handling stress or changes in routine. He has noticed that he was very stressed, moody, and angry, which was unusual. He could play video games, puzzles, or use a computer. He reported that he needed help filling out the form because he did not understand all of the questions. (Tr. 191-201.)

On an undated form, Sumpter reported that he had been prescribed Abilify for depression and Prestige for anxiety by North Central. (Tr. 220.)

### III. The ALJ's Decision

The ALJ determined that Sumpter met the insured status requirements of the Social Security Act on September 30, 2010. The ALJ also concluded that Sumpter has not engaged in substantial gainful activity since February 23, 2007, the alleged onset date. (Tr. 12.) The ALJ found that Sumpter has the severe impairments of degenerative disc disease, depression, anxiety disorder, and personality disorder. However, the ALJ determined that Sumpter did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13.) The ALJ found that Sumpter had the residual functioning capacity ("RFC") to perform light work with the following restrictions:

> he can occasionally stoop, kneel crouch, crawl, and climb ramps and stairs; he cannot climb ladders, ropes, or scaffolds; he is limited in reaching in all directions; he should avoid concentrated exposure to extreme cold and vibration; he should avoid even moderate exposure to hazardous machinery and unprotected heights; he must work in relative isolation and should have only limited contact with peers, supervisors, and the general public; he is able to remember and understand short and simply instructions and carry out simple, routine tasks; he is

able to adapt to changes in a work environment; and he is able to sustain a level of concentration necessary for unskilled work.

(Tr. 15.)  The ALJ determined that, given Sumpter's RFC, he was unable to perform any past relevant work.  (Tr. 22.)  Finally, the ALJ determined that Sumpter could perform a significant number of jobs in the national economy, including apparel stock clerk, motel housekeeper, and small parts assembler.  Thus, the ALJ found Sumpter not disabled.  (Tr. 23.)

## IV.  Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-

        exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a

        proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner

reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id*. at 1322.

## V. Discussion

Sumpter alleges two points of error in the ALJ's decision. First, he argues that the ALJ should have determined that he met the requirements of listed impairment 12.05C at step three.

*See* 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05.  Second, he argues that the ALJ should have given controlling weight to Dr. Blount's opinion.  Because Sumpter is unable to show that he meets the diagnostic requirement of Listing 12.05 and because the ALJ's treatment of Dr. Blount's opinion was supported by substantial evidence, the undersigned recommends that the Commissioner's decision be affirmed.

## A.    Listed Impairment 12.05

Listing 12.05 sets forth the Commissioner's requirements for finding mental retardation:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.* the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  The regulations guide the listing's interpretation:

Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing."

*Id.* at § 12.00A.  The requirements of the introductory paragraph – the diagnostic description of mental retardation – are therefore mandatory.  *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).  In order to qualify as mentally retarded under Listing 12.05C, Sumpter was required to show (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning, (2) an onset of that impairment prior to age twenty-two, (3) a valid IQ score between 60 and 70, and (4) an additional impairment imposing a significant work-related

limitation of function. *See Cheatum v. Astrue*, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (holding that a claimant must prove deficits in adaptive functioning in addition to the elements of paragraph C) (citing *Randall v. Astrue*, 570 F.3d 651, 659-60 (5th Cir. 2009)); *Maresh*, 438 F.3d at 899.

The ALJ found that the record contained no evidence of deficits in adaptive functioning prior to age twenty-two, that there were no valid IQ scores in the record, and that there was no evidence of an additional impairment that manifested prior to age twenty-two. Thus, the ALJ concluded Sumpter did not meet the listing requirements. Sumpter argues that his IQ scores were valid and that the ALJ improperly required Sumpter to show an onset of his additional impairment before age twenty-two. The ALJ also suggested that Sumpter did not demonstrate the deficits in adaptive functioning necessary for mental retardation as an adult:

> As an adult, the claimant demonstrated his ability to live independently and successfully maintain full time employment of a semi-skilled nature without requiring any significant accommodation by his employers. The claimant was able to obtain a driver's license, although the same is now suspended, and demonstrated his ability to drive and navigate [a] vehicle, as well as his ability to use public transportation. The claimant has been able to marry and care for his children. For these reasons, any alleged borderline intellectual functioning does not satisfy the listing criteria under 12.05.

(Tr. 15.)

In his brief, Sumpter does not discuss the ALJ's determinations that he does not meet the diagnostic description of mental retardation. Sumpter's arguments focus entirely on paragraph C. As explained above, it is not enough for a claimant to meet one of the severity requirements of Listing 12.05. A claimant must also show that he or she meets the diagnostic definition of mental retardation. "Those requirements clearly include demonstrating that the claimant suffered deficits in adaptive functioning and that those deficits initially manifest during the developmental period." *Cheatum*, 388 Fed. Appx. at 576 (citations and internal quotations omitted).

"The claimant bears the burden of proving disability." *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). "A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." *Hacker v. Barnhart*, 459 F.3d 934, 937 n.2 (8th Cir. 2006). Sumpter's failure to raise or discuss the ALJ's explicit finding that Sumpter did not demonstrate deficits in adaptive functioning before age twenty-two, and her implicit finding that Sumpter was not presently deficient in his adaptive functioning, is therefore an abandonment of those issues. *See also Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting "out of hand" argument that claimant met a listing because claimant "provide[d] no analysis of the relevant law or facts" about the listing); *Perez v. Barnhart*, 415 F.3d 457, 462 n.4 (5th Cir. 2005) (argument waived through inadequate briefing); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (issue not framed and developed in a manner sufficient to invoke appellate review); *Cue v. Astrue*, No. 1:11-CV-66, 2012 WL 352294 (E.D. Ark. Feb 12, 2012) (collecting cases and holding that claimant had waived claim that she met a listing by failing to allege that she met two of the elements of that listing).

Even if Sumpter had argued that the ALJ's determination that he did not meet the diagnostic description of mental retardation was improper, the ALJ's decision was supported by substantial evidence. As the ALJ noted, Sumpter's ability to do semi-skilled work is not consistent with mental retardation. *See Cheatum v. Astrue*, 388 Fed. Appx. 574, 576; *Hines v. Astrue*, 317 Fed. Appx. 576, 579 (8th Cir. 2009). Sumpter's abilities to care for himself, care for his girlfriend's children, drive a car until his license was suspended for driving under the influence, utilize public transit, cook dinner, and perform housework are likewise inconsistent with mental retardation. *See* Clark v. Apfel, 141 F.3d 1253, 1255-56 (8th Cir. 1998) (ALJ properly rejected IQ scores where scores were inconsistent with claimant's unrestricted daily

activities-reading, writing, counting money, driving, cooking, cleaning, shopping, and taking care of young child-and no medical records indicated she was mentally retarded prior to age 22).

Thus, even if Sumpter had properly appealed the ALJ's determination that Sumpter did not demonstrate the deficits in adaptive functioning necessary to meet Listing 12.05, that decision would have been supported by substantial evidence. Because Sumpter is unable to show that he meets the diagnostic description for mental retardation, his argument that he meets the severity requirement of paragraph C is irrelevant.[8] The undersigned recommends that the ALJ's decision at step three be upheld.

## B.     The Weight of Dr. Blount's Opinion

Sumpter argues that the ALJ erred in not affording controlling weight to his treating psychologist, Dr. Blount, when determining Sumpter's RFC.[9] Instead, the ALJ gave Dr. Blount's opinion "some, but not great weight and consideration." (Tr. 21-22.) She "modified [Dr. Blount's findings] to reflect moderate, rather than marked or extreme, limitations in the determination of the claimant's RFC in order to be consistent with the evidence of record as a whole." (Tr. 22.) She explained that she was troubled by Dr. Blount's apparent nonchalance about Sumpter's recent methamphetamine use:

> Although the claimant had been abusing drugs throughout his treatment with Dr. Blount, and had only been recently released from inpatient care for drug use, Dr. Blount opined the claimant's limitations were not grossly affected by substance use since the claimant was staying clean and abstinent at this time . . . . Due to the fact that Dr. Blount made this assessment a mere seven days following the

---

[8] Sumpter is correct that the ALJ used an improper rule when evaluating the second prong of Listing 12.05C. The ALJ found that Sumpter had no additional mental or physical limitation whose onset had occurred before age twenty-two. This is not what Listing 12.05C calls for. Instead, the ALJ should have only evaluated whether Sumpter had an additional and significant work-related limitation of function, which would presumably have been satisfied by one or more of Sumpter's "severe" limitations identified by the ALJ at step two. The ALJ's rejection of Sumpter's IQ score is a closer question, but it need not be resolved because Sumpter has not demonstrated that he suffers deficits in adaptive functioning.

[9] "[A claimant's] residual functional capacity is the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). Residual functional capacity determinations are "based on all of the relevant medical or other evidence." § 404.1545(a)(3).

claimant's release, it seems incredulous to formulate such an opinion concerning ongoing functional limitations in the absence of drug abuse.

(Tr. 21.)  The ALJ gave "significant weight and consideration" to the findings of Dr. Frisch, a non-examining state psychiatrist, "as consistent with the medical evidence and the record overall."  (Tr. 21.)  She also opined:

In terms of the claimant's psychological functional limitations, the same appear to be exacerbated by non-compliance with his psychotropic medications in conjunction with illicit drug use.  The mental health records reflect the claimant has improvement when he takes his medications as prescribed and abstains from drug and alcohol abuse.

(Tr. 20-21.)

"The opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record."  *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (citing 20 C.F.R. § 404.1527(c)(2)); *see also* 20 C.F.R. § 416.927(c)(2).  "Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (internal quotation marks removed).  However, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the hearing examiner must evaluate the record as a whole."  *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted).  "It is well established than an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained in the record."  *Id.* (quoting *Prosch v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999).  The question, then, is whether Dr. Blount's opinion conflicts with substantial medical evidence in the record.

Sumpter argues that the ALJ cited no other medical evidence in the record in discounting Dr. Blount's opinion. He also argues that Dr. Frisch's opinion, cannot be considered substantial evidence on the record as a whole, citing *Shontos v. Barnhart* 328 F.3d 418 (8th Cir. 2003). It is true that "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Id.* at 427. However, when accompanied by other evidence, the opinion of a non-examining doctor may help to form substantial evidence on the record as a whole. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (finding that opinion of non-examining doctor, in conjunction with inconsistencies between treating doctor's notes and opinion and indications that claimant simply lacked motivation to work constituted substantial evidence supporting ALJ's rejection of treating doctor's opinion).

In this case, the ALJ did not rely solely on Dr. Frisch's opinion. She also examined other evidence of record inconsistent with Dr. Blount's opinion. First, she considered the consultative psychologist's opinion. "He opined the claimant's basic work-related functional abilities were basically intact and had mild to moderate limitation of social and adaptive functioning." (Tr. 19.) Dr. Frisch, in rendering his own opinion, gave significant weight to Keough's opinion. (Tr. 426.) Keough, after meeting with Sumpter, found:

> The claimant's ability to understand and remember instructions on a sustained basis, necessary to make routine work-related decisions, without supervision, is somewhere between the simple or moderate level of complexity, as long as he is not using alcohol or other street drugs. Mr. Sumpter's ability to sustain concentration, be persistent in tasks and maintain an adequate pace in productive activity, necessary to be gainfully employed working 40 hours a week, in a mainstream work-related environment, for a duration of at least 12 months, with regard to psychological issues, would be adequate, up to a complex or demanding setting.

(Tr. 412.)

The ALJ noted that one reason she discounted Dr. Blount's opinion was that his examining relationship was contemporaneous with Sumpter's drug use. The ALJ traced Sumpter's history with Burrell during the four months leading to his inpatient treatment at Royal Oaks. She found, and the record reflects, that Sumpter's condition steadily deteriorated. (Tr. 18, 437-40, 451-70, 487-99.) She further found that Sumpter used methamphetamines during this period. (Tr. 18.) The record supports this finding. Burrell's records include recurring suspicions that Sumpter was a methamphetamine user. (Tr. 460, 462, 464). The suspicions were confirmed when Sumpter was admitted to Royal Oaks for inpatient mental health treatment, where he confessed his illicit drug use. (Tr. 475.) After his discharge, Sumpter admitted his methamphetamine use to Dr. Blount. (Tr. 497.)

Dr. Blount cited Sumpter's problems with explosive anger and mood regulation, but also opined that Sumpter's limitations were not "grossly affected by substance use." Sumpter's social worker noted that methamphetamine use would "lead to increased aggression and mood instability." (Tr. 460.) This inconsistency in Burrell's records casts doubt on Dr. Blount's opinion, particularly since he offered no explanation for why Sumpter's limitations were not affected by drug use, nor did he link drug use to Sumpter's mental problems. Instead, he made a conclusory statement that drug use was not a contributing factor. *See Wildman v. Astrue*, 596 F.3d 959, 964 (holding that it is proper to discount the opinion of a treating source if that opinion is conclusory).

The ALJ also found that, during the same time that Sumpter was being seen by Dr. Blount and the Burrell social workers, he also was consistently failing to take his prescribed medications. (Tr. 18.) This finding is based on substantial evidence in the record. (Tr. 457, 458, 459, 460, 462, 468, 475.) Where a claimant does not follow prescribed treatment and a medical

source does not account for this noncompliance, then that failure "can constitute evidence that is inconsistent with a treating physician's medical opinion." *Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008).

Dr. Blount's opinion did not take medication noncompliance into account. Further, while the record demonstrates that Dr. Blount was aware that Sumpter was not taking his medications, none of the records indicate that Dr. Blount linked that noncompliance to mental illness. *Compare Wildman* 596 F.3d at 966 (holding that ALJ did not improperly discount the treating physician's opinion in part because there was "little or no evidence expressly linking [claimant's] mental limitations to such repeated noncompliance") *with Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (holding that the ALJ erred in finding claimant's noncompliance with medication unjustified where "the evidence overwhelmingly demonstrate[ed] [claimant's] noncompliance was attributable to her mental illness"). The ALJ's finding that Sumpter was noncompliant with his prescribed medications was supported by substantial evidence. Dr. Blount's failure to address Sumpter's noncompliance or link it to Sumpter's mental illness made it proper for the ALJ to afford lesser weight to his opinion.

Further, when Sumpter was discharged from Royal Oaks, Dr. Khreis estimated that Sumpter's current GAF was 65. A GAF score of 65, which reflects mild symptoms or some difficulty in functioning, is inconsistent with Dr. Blount's contemporaneous assessment that Sumpter had several marked limitations. (Tr. 479.) An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch,* 201 F.3d at 1013.

Other evidence in the record supports the finding that Sumpter's RFC is greater than what Dr. Blount estimated. He was able to engage in light, semi-skilled employment at Barnes without major difficulty in 2008 and 2009. (Tr. 12, 47, 158-59.) In 2007, both Sumpter and his girlfriend reported that he was able to do yard work and housework, limited only by a back injury. He was also able to navigate public transportation on his own, go grocery shopping, pay bills, handle a savings account, count change, use either a checkbook or money order, socially interact with family and neighbors, get along with authority figures, go places without being reminded, and follow instructions to at least a "fair" degree. (Tr. 173-80, 191-203.) While they also indicated that he had trouble interacting with others and had anger issues, this is consistent with the ALJ's finding that Sumpter "requires work in relative isolation with limited contact with peers, supervisors, and the general public." (Tr. 15.) Shortly after being discharged, from Royal Oaks, Sumpter told Dr. Blachar, his pain specialist, that his mental health medications "have helped him significantly." (Tr. 484.)

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.* Here, the ALJ resolved one such conflict. Dr. Frisch, based on his review of the medical records and the consultation by Keough, felt that Sumpter was moderately limited in some areas. Dr. Blount believed that Sumpter's limitations were more severe and pervasive. After examining the record, the ALJ found that Sumpter was able to function at a higher level than Dr. Blount believed. The ALJ did not entirely discredit Dr. Blount's opinion, giving it some weight in determining that Sumpter's limitations were moderate. The undersigned finds that the ALJ did not improperly assign lesser

weight to Dr. Blount's opinion, and that the RFC determination is supported by substantial evidence.

Sumpter additionally argues that the ALJ ignored the factors she was required to consider to weigh Dr. Blount's opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). However, the ALJ thoroughly evaluated the record before determining what weight to give to Dr. Blount's opinion and before assessing Sumpter's RFC. Further, the ALJ's decision to afford only some weight to Dr. Blount's opinion was explicitly based on that opinion's inconsistency with the rest of the record, which is one of the factors required in the evaluation. "[A]n arguable deficiency in opinion-writing technique does not require [the court] to set aside a finding that is supported by substantial evidence." *Carlson v. Chater*, 74 F.3d 869 (1996); *see Gaston v. Astrue*, 276 Fed. Appx. 536, 537 (8th Cir. 2008).

Because Dr. Blount's opinion was inconsistent with substantial evidence on the record as a whole, the ALJ did not err in discounting it. Consequently, her determination that Sumpter retained the RFC to perform certain unskilled work within limitations stated in her opinion was supported by substantial evidence. The undersigned therefore recommends that the ALJ's RFC determination be upheld.

## VI. CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Sumpter is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Sumpter in his Complaint (Doc. #1) and Brief in Support of Complaint (Doc. #15) be **DENIED** and that judgment be entered in favor of Defendant.

The parties are advised that they have fourteen (14) days to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 31st day of July, 2012.

_____/s/ Nannette A. Baker_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE